Case Numbers 23-3087 and 23-3144, Endless River Technologies LLC v. Trans Union LLC Oral argument not to exceed 15 minutes per side. Mr. Schaffer for the appellant. Counsel, if you'd state how many minutes you're reserving for rebuttal. Thank you, Your Honor. We'd respectfully ask to reserve four minutes for rebuttal. Whenever you're ready. Good morning, Your Honors, and may it please the Court, Derek Schaffer here on behalf of the appellant. Your Honors, this appeal concerns a flagrant contractual breach by Trans Union that rendered the crown jewel of the party's joint venture, or groundbreaking source code, completely worthless four years hence when Trans Union, only on the eve of trial, finally returned the code it had long owed my client. After the jury awarded damages of $18.3 million, the judge wiped that away to zero solely because he ruled these damages categorically unavailable under Illinois law. That, Your Honors, was obvious error, and we respectfully submit that it should be reversed. Well, doesn't the party's contract, even if we agree with you that there was a breach of the contract in terms of not turning back over the code or anything like that, doesn't the contract of the parties expressly rule out the damages that you were seeking? Your Honor, what it says is that consequential damages are unavailable, and that can include lost profits. It is settled Illinois law from the Illinois Supreme Court on down. You have it in Midland Hotels and the Westlake case from the Illinois appellate court that that language, indistinguishable language, should be read so that the question comes down to are the lost profits direct damages or are they consequential? And that's agreed to. The district court acknowledged that, and my friends for Trans Union acknowledge that too. So the question, Your Honor, is was it direct damages under the party's contract? And that question needs to be answered relative to the specific provision that was breached. And I direct Your Honors to Appendix 22, that's Exhibit A of the party's contract, specifically when it gets to Phase 3. And what that language there says, Your Honors, is that the code shall revert to Trans Union, that's Section 2 of the contract, that's the general rule, but it shall revert to Trans Union at that phase so that it can be, quote, marketed and monetized by Endless River. That's how Endless River would in turn pay Trans Union back. So this contract explicitly answers the question, what was the party's understanding as to why the source code needed to be returned to Trans Union, to Endless River? It needed to be returned to Endless River so that Endless River could market and could monetize. And Judge Davis, I'd respectfully submit when you look at the cases that say, are lost profits direct, including the Midland Hotels case from the Illinois Supreme Court, you don't have a case that's as easy and as straightforward to say, based on the explicit terms of the contract and the provision that was breached, yes, the parties understood and agreed that this is why the source code would be returned, precisely so that they could monetize it and derive the value that was denied to them. Beyond that, Judge Davis, do you... I'm struggling. I'm struggling with how you would say this calculation should have been made. I agree that this record shows that the claim and the proof was geared toward diminution in value. But my question is, particularly in light of the standard that was used to evaluate it, diminution in value of what? Was it the code or was it the value of the entire entity? Good question, Judge France. I think that those are one and the same here because we have basically a one product company. So the source code was what Endless River was about. That's what they were looking to derive value from. But Dr. Malik's analysis, to answer your question, Judge France, precisely, it was pegged to the value of the source code and what the source code was meant to do on the market. And when you have IP like this, the only way that you can arrive at a competent valuation is basically the way that Dr. Malik did. He used the accepted methodology, the venture capital method. He used a 70 percent discount rate to account for uncertainties. He looked at market benchmarks. He looked at comparators to do a reality check and determine what should the valuation be. And he was qualified to do all of that. I understand that. But what strikes me and what I'm struggling to understand is how can it be that the $55 million is not actually related to this approach of venture capital, which always includes the assets of the entity itself, both its human capital as well as its code, its asset value. And in a startup, isn't that the very issue? You are starting up something and part of your sale is, I have the best minds, I have the best businessmen, I have people with a track record. The men and women involved in this organization are the value of the startup. So how can you not distinguish that here? Judge Strange, I think you can't distinguish that here because that is part of the value of the IP. The IP for the quote exchange was meant to be in service of, yes, a market initiative and Endless River was especially positioned to pursue that. But that was the party's contemplation was that you would operationalize the source code. That's what Exhibit A and what we were looking at for Phase 3 was talking about. You would operationalize it by marketing and monetizing. But for the breach here, they would have had the market and monetization of the source code. This is, I think, this valuation is exactly the right way and the only way to capture direct damages. And Judge Strange, let me also put it this way. If you credit what the District Court credited from TransUnion, you can never arrive at a valuation because if Dr. Malik tried to value the source code without saying what could it do on the market, what are market comparators, what was its potential, they would pillory him for that. They'd say there was no account taken of potential earnings from intellectual property which is always going to be part of any competent valuation. And I'd also note that the District Court didn't give our analysis the credit that Your Honor did. The District Court operated under the misconception that Endless River, quote, did not attempt to define that value and did not seek that value as damages. That's at page ID number 14634. That's completely wrong, Judge Strange, with all due respect. That's exactly what Dr. Malik was doing and it's also undisputed that the jury could reasonably conclude that the source code had been rendered valueless, totally valueless. So it's a total loss in value. It's not some diminution of a portion of the value. By the time it was returned, four years after the fact. And that's what the jury found. What is your best case that you would rely on to make the point that this is one of those occasions where lost profits is a direct damage? Two cases. Midland Hotels from the Illinois Supreme Court where, in fact, it was just failure to list the plaintiff in the yellow pages. And so you had to go beyond the contract and just say, well, what is the nature of a yellow page listing? That's meant to generate business. The court applied common sense to get to that conclusion. Here, as we were looking at, the contract answers the question that the parties were explicitly contemplating that this provision, the one calling for return of the source code to Endless River, was meant to enable the marketing and the monetization of it. One other point, and then there's the Powell case from the Texas courts that TransUnion convinced the district court to rely upon as its sole support. And as we have pointed out, when you read the Powell case, it actually says that certain damages are direct because they were contemplated by the parties' contract. And the only reason that other damages were disallowed is that when you read the parties' contract, they didn't understand that there was going to be a particular consequence of the breach. Again, this contract tells us that this form of damages is exactly what the parties contemplated. So even under the Powell case, we should... Then the question becomes, what was the interrogatory to the jury? And did the interrogatory to the jury ask that distinguishing question? It didn't, Your Honor. It did tell the jury they needed to find that there was reasonable certainty for the damages and that they were not speculative. The judge reserved ruling on the question we're talking about. Now, were they nonetheless disallowed by the parties' contract? And that's where we think the judge erred and didn't give due credit to what the jury had properly decided. Sorry, Judge Batchelder. I know you had a question. As of what date should this value have been determined? April 2018, the date of the breach, Your Honor. And that's what Dr. Malik testified he was doing. He testified to that repeatedly and unequivocally. And one other point, Judge French. You mentioned the $55 million valuation. I would note that's what we were urging upon the jury. The jury didn't give us that. The jury said they weren't going to give us the appreciation that Dr. Malik had included in his analysis. They chopped us down to $18.3 million. It was a very thoughtful jury that wasn't giving either side exactly what they wanted. I'm not challenging that as a departure from what was fairly within the jury's discretion. It's the judge and TransUnion that are trying to do away with the jury's verdict and wipe that number down to $0. And if they were to succeed in that, it's basically a license to strangle IP in the cradle to commit the most egregious contractual breach and then say the damages from that, if there are any, are basically peanuts. That's not what Illinois law commands. And I'm sorry, Judge French. I understand that your time is short, so I want to be sure I get the answer here. I don't dispute that there is danger in how this ruling could be used depending upon how it comes out. What I'm struggling with also is wasn't part of this suit your tortious interference claim? If you had this venture capital issue and evaluation, did you abandon this? Or did you dismiss the tortious interference claim? What happened to that? It was dismissed, I think, by the judge, Your Honor. But in any event, it's part of our contractual breach subsumes it. Because had the source code been returned to us under the contract, we would have been able to derive the value. I think it was made even worse by the fact that TransUnion was effectively sabotaging efforts by Endless River to launch on its own. But we were able to pursue the damages calculation through the breach of contract because what should have happened is that the code should have come back to Endless River and Endless River should have been free to pursue that. What about the $1.85 million valuation of getting the code to where it was? Why is that not a distinct number from the 18.3 jury verdict? Because, Your Honor, it's dependent upon a mitigation theory that we could have made ourselves better off by developing the code. We couldn't. This all happened in April 2018 when the window to pursue the market opportunity was closing on us. So to start from scratch then to develop new source code would have been worthless. But even worse than that, the record shows, there's undisputed testimony, that TransUnion was sabotaging efforts by Endless River to pursue its own relationships. So instead of mitigating… Which is tortuous interference. I'm sorry? Which is tortuous interference. Which would have been tortuous interference too, but it also vitiates the defense of mitigation. What we would have been doing had we poured good money into bad, basically spent $1.8 million developing source code, we would have compounded our damages because TransUnion was essentially souring the market and making sure it could hold onto the code for itself. And you can see page ID number 12866 where TransUnion was wanting to pivot on this source code for its own use. So when they say this was valueless source code and there was nothing Endless River could do with it, you don't need to believe them, Your Honors. And the jury certainly didn't need to believe them on that. They wanted it because it was valuable for TransUnion. And I think that is further reason why the jury verdict should stand. I know that I've gone over my allotted time for this portion of the argument, Your Honor, so I respectfully reserve the remainder for rebuttal if there aren't other questions. Yes, thank you. Thank you. Good morning, Your Honors, and may it please the Court. Britt Kramer for TransUnion. The District Court's ruling here vacating the damages award to Endless River is both straightforward and correct, albeit belated in the history of this case. As the trial court succinctly explained, and this is at record entry 288, page 14634, the only contract breach, the only one that Endless River alleged and proved at trial, is that it failed to get the source code back timely after termination. Now that source code that was developed for a failed business idea called the quote exchange, that despite four years of effort and over $8 million in spend, never turned a single dollar in profit. And the direct damages that would be associated with this breach, with the failure to return this specific code, which forms a portion of what is needed to make the quote exchange platform run, which itself only forms a portion of the value of Endless River's business enterprise, would be, and I'm quoting the District Court here, the value or a portion of the value of the code itself. But as that court properly found, and I'm quoting again, quote, Endless River did not attempt to define that value and did not seek that value as damages. Instead, the only damages evidence Endless River presented at trial was the estimated value of a different thing, of the hypothetical future revenues that Endless River claimed it could secure by taking that source code and going on to do a lot of other steps. Well, that's an accepted method of valuing a business, the venture capital method, isn't it? The venture capital method, Your Honor, certainly is an accepted methodology of valuing a business. And the distinction that you drew earlier with Endless River's counsel is exactly the right one. What the venture capital method values is an entire business enterprise. And we know that just from Dr. Malik's approach itself, which applies a revenue multiple to these speculative future revenues, and that revenue multiple, among other things, is intended to capture those other aspects of the business, aspects that TransUnion had no engagement with and no obligation under the contract to address or provide to Endless River at all upon termination. So on the basis of what they did have a contractual duty to do, what are the direct damages for TransUnion's failure to return the source code and breaching the contract thereby and instead claiming publicly it was their own? Well, Your Honor, the direct damages in that case would be the value of the source code itself. And there are a couple benchmarks for this in the record that Endless River could have argued, including but not limited to its own contemporaneous valuation of the replacement cost of building that code for $1.85 million, in its own words, with better, more affordable technology. So that could have been an option. So how would they have monetized that rebuilt product when TransUnion was at the same time stating in the market that it owned the code? Your Honor, they dropped their tortious interference claim voluntarily. So that entire argument about what the statements in the market were that arguably, according to them, prevented them from going out and marketing a new product, they voluntarily dismissed that after the first day of trial. The court also found there was no valid basis for a slander or a defamation or a defamation of title claim because all of the statements that TransUnion made to the market were correct. They simply stated that TransUnion was shutting down the TransUnion quote exchange. True. The branded name that they were using for the TransUnion product. And again, you could take the source code or build a new different source code. Name this something else. They could not counsel take the source code because TransUnion refused to give it to them. They could take their rebuilt source code, Your Honor. I appreciate the distinction and that's a good clarification. An important distinction in a contract breach claim. Agreed. Agreed. But what they could have done is they could have rebuilt this code by their account for 8.5 million at most and they could have launched a separate product. They could have named it something else. There's nothing magic about the name TransUnion quote exchange. That's just the title they decided to apply. I'm talking about the argument that they should have mitigated your client's damage to them. The issue is not how they could have mitigated your client's damage in breaching the contract. The question is what is the value of the breach? Agreed. And the question can be answered because the value of the breach is equivalent to the value of the code which they value contemporaneously as something that could be replicated. Again, replicated with better, more affordable technology for a very low dollar value. 1.85 million. That's the value of the code. It's the value they put on it at the time. What is your understanding of what the $18 million award by the jury was for? Well, our understanding is that it's predicated on consequential damages that should never have been presented to the jury in the first place. That are barred by the contract, section 8.2, the waiver provision and limitation of liability and that are barred under the Illinois new business rule. The only way the jury could have gotten to 8.3 million is to have somehow anchored itself at a high number that was presented by Endless River at some point. We don't know what they did with that number or how they cut it down or why they got to this additional $18.3 million number. But the only other numbers in the record are the numbers presented by TransUnion, the contemporaneous documents from Endless River at the time of the breach are much, much lower, right around that 1.8 or 1.7. Let's suppose that a venture capital approach is the proper way and you've said, well, yeah, but not just for the code. We're talking about a whole business. But what would you say, where would you say the information would have had to come from to support a venture capital approach even if we were looking at a whole business as of the date of the breach? If we're assuming for purposes of this argument that it would be appropriate to measure the business enterprise, which we contend it is not, but if we were to take that as a given, the correct thing to have done here would have been to, first of all, measure the value as of the correct time and the correct date. Malik, what he did is he took projections from 2013 that were five years old at the time of the breach and he projected them forward. He assumed they were true. They're contrary to the historical reality. They're 900 times larger than the revenue that the quote exchange in fact earned over the course of its entire lifetime. And I apologize. No, that's right, the revenue. So there's no profit, right? There was only revenue, $240,000 over the course of the lifetime. What he did is he took these old projections, assumed they were true without independent verification or analysis of any kind, took his client's word for it, projected them forward, discounted them back to 2014, an irrelevant date, and then grew them for nine years to the time of the trial, also an irrelevant date. And what he testified was that it didn't matter to his analysis when the date of the contract breach was. Endless River could have, or TransUnion could have breached this contract, he said, in court, at trial, the week after it was signed or the month after it was signed. And he was going to get to that same damages figure of $55.2 million. So at a minimum, if he were going to apply the venture capital method, he would have needed to look at the real data around 2018. He would have needed to have started his analysis as of the relevant date, which is April 2, 2018. And he should have taken into account the historical performance of the quote exchange. And I would submit that in Illinois, given that the new quote exchange, whatever it was going to be after termination, was absolutely a new business because it would involve new hypothetical technology, new hypothetical partners, new hypothetical insurance carriers, and new contracts. There was no basis, actually, to do that measure of damages here under Illinois law. Your bottom line was this was all speculation. This was all speculation as of an irrelevant date. And it is barred by the law of the state that the contract designates as the state governing the contract, Illinois, which has a specific rule that relates to this idea in particular. The new business rule that says where there's no historical record for the business and where there's no evidence that the past profits of the business are reflective of future performance, you can't do this at all. When did that come into effect, that new business rule? Oh, you know, I can get that information for your honor, but it has been in effect since at least the mid-90s. And this case was filed in 2018. Thank you. So the valuation that you say that Endless River, if they were going to get direct damages, should have relied on, what was it comprised of, this valuation? The valuation by Dr. Malik, what they actually did? The valuation, you said that they had done a valuation. They did not rely on that. Instead, they went forward with what their expert said and did it that way. I see, I see. What is the 1.85 number that they? I think you said 1.85 up to perhaps 8.5? No, no. Sorry, I misspoke if I did. So what happened was Endless River, after this contract terminated, went and tried to find somebody else, a new partner, to actually replicate the source code and then do all these other consequential steps that would need to happen before they could turn the source code into a functional business and then actually generate revenue. And so what they did is they went to players in the market, and they represented to players in the market that the cost to rebuild the code, which they were getting from quotes from third parties who they were speaking to about replication of the technology, was 1.75 or 1.85 million. And so what that means is it's a party admission that we're entitled to take as true from Endless River themselves. And I understand, based on their testimony and the court record, that it's based on their communications with third-party programmers and other technology folks about what those people told them it would cost. Does that address your question? It does address my question, but I'm a little skeptical that if they had come forward and even said that, that your client would have said, yeah, that seems reasonable, that's what we'll pay. Absolutely not, Your Honor. We've offered that many times. Okay. I have a brief point that I haven't addressed yet from the court's questions, which is simply the waiver point. And, Judge Strange, I understand your position that this was a diminution in value estimate, but we disagree, and we disagree for several reasons. The first of those reasons is simply Endless River's conduct and discussion and description of its own damages over the four-year history of this case. So Endless River led off this appeal by saying this is actually a diminution in value claim, not a consequential lost profits claim, and says that's reason enough to set aside the court's misapprehension of its damages. But before trial, during trial, and after trial, Endless River described its own damages as direct lost profit damages, not as some diminution in value claim. And as just one example, if you look at their post-trial briefing alone, which is, of course, the ruling that they're appealing from, and that's Record Entry 283, Endless River references lost profits in that filing more than 65 times, but does not use the phrase diminution in value even once. And even after this court's ruling, when it decided to appeal that ruling and submit it to your honors, Endless River continued to describe its profits as lost profits, and if you look at its civil appeal statement before this court, which is Docket Entry 16, the primary issue that Endless River articulated as bringing up on this appeal is, and I'm quoting here, whether the trial court erred in granting TransUnion's motion for judgment as a matter of law by holding that Endless River's lost profits were consequential rather than direct damages. This diminution in value theory and label, while it was raised in passing references occasionally during sidebars, at trial itself, well after discovery closed, well after expert depositions and a Daubert hearing that lasted half a day, concluded where this theory was not squarely raised or supported, it was only after new counsel came on for purposes of this appeal that we started hearing this idea that this is actually not a lost profits measure, but a diminution in value measure. And so our argument on that front for what it's worth is that characterization is not only incorrect, but it is also waived in all events and you need not consider it. And if the court doesn't have any other questions, we'll rest on our papers. I do not. Thank you. Thank you. Thank you, Your Honors. I'm back. And let me start with this. Most of what you were hearing from my friend for the other side, that is not the district court's rationale for throwing out the jury verdict. That rationale was that as a matter of law, Endless River's theory of damages was foreclosed by the party's contract. That's it. It wasn't about Dr. Malik. It wasn't about the jury's verdict. It wasn't about anything else. So if you agree with me that that was wrong as a matter of Illinois law, that alone is basis to reverse. And I embrace counsel's reference to Illinois law and the specifics of that. I would note that it is black letter Illinois law that any limitation of liability provision is strictly construed against the drafter. That's why, notwithstanding what you were citing, Judge Davis, in terms of the restriction on damages, it comes down to are the damages direct for purposes of the specific provision that was breached. That's what we were talking about with Exhibit A. That's the language about marketing and monetization. And the contract itself tells you that the direct damage from the breach here, the wrongful withholding of the source code for four years, is that Endless River was losing the opportunity to market and monetize that. I.e., to derive value in the marketplace. That, Your Honors, is basis to reverse. And then you get to the alternative grounds for affirmance, which I would also like to address. But as to the question, Judge Davis, about the $1.8 million number, let's be clear, that's not a valuation. That's not a valuation. That's their account of what Endless River could have done to develop the source code from scratch. TransUnion offered no valuation to the jury. They didn't want to do that. They wanted to strictly limit their damages in ways that I think are contrary to not just fairness and common sense, but also Illinois law. And it really came down to what would Endless River have obtained from the source code had it been marketing and monetizing it as the contract enabled it to do. So from your perspective, using this term valuation for that calculation is really kind of inaccurate. Well, I think that's right. Absolutely, Judge Davis. It's not that. It's a replacement cost calculation. It's not the expectancy under the contract, which we're entitled to. But also understand the breach happens in April 2018, Judge Batchelder. That's as the market window has been opened and is starting to close. The reason the contract was structured the way it was, it was a five-year contract, and it started in 2013. That gave TransUnion five years to be developing the source code. No one can pretend that Endless River could have just snapped its fingers, developed the source code from scratch, and been where it should have been on the market, able to pursue the marketing and monetization opportunities that were still there in April 2018, but were not going to be there much longer. And Endless River certainly couldn't have done that so as to mitigate its damages when TransUnion was sabotaging it in the marketplace, according to testimony that the jury heard and was entitled to credit. But what was your – on what did your expert base his calculations? It was the venture capital method, so to go through that – Well, it was, but venture capital method requires that you have some kind of real evidence that you're using to do that. And so the concern I have is that this – isn't this rather speculative, the entirety of it? I don't think it is, Judge Batchelder. And when you're talking about intellectual property for a startup, the only way you're going to get to a fair valuation is through some method like this. So what Dr. Malik validated were the numbers that were used as far as what was the market opportunity projecting forward from 2013 into 2018. What were comparable market entities realizing in the way of returns? What was their valuation as a multiple? What's a fair discount rate? Because none of this is certain. He'd used a conservative assumption, a 70% discount rate, Judge Batchelder, precisely because he wasn't saying it was 100% certain. There was a 70% risk rate. That's how he got to the number that the jury credited, 18.9. It's not a mystery how did the jury land at 18.3. They took four steps of Dr. Malik's analysis, and they did not include the growth rate that Dr. Malik had used, the year after year after year growth rate that would have gotten to a number above $55 million. They wouldn't follow us that far. Maybe that was too speculative for them, Judge Batchelder. But they had rock-solid evidence from Dr. Malik in landing at the 18.3. Last, Your Honors, very quickly, the theory of waiver you can judge for yourselves. But when they're indicting our attempt to value the intellectual property, it is truly incoherent for them to fault us as though we were not trying to do what the district court faulted us for not doing. We were driving at valuation. We were driving at the diminution in value that's abundantly clear from the trial record, from the arguments, and from the briefing and arguments to Your Honors. Thank you very much. Thank you. Thank you to the parties for your preparation and for your argument here. The case is taken under advisement. Submit it.